IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

ALICIA CRABTREE, as
Power of Attorney for
GENE HARRISON,

          Plaintiff,

v.                                        Civil Action No.: 3:15-CV-13318

SEVENTEENTH STREET ASSOCIATES, LLC d/b/a
HUNTINGTON HEALTH AND REHABILITATION CENTER;
SMV HUNTINGTON, LLC;
SSC HUNTINGTON OPERATING COMPANY LLC;
SSC SUBMASTER HOLDINGS LLC;
SSC EQUITY HOLDINGS MT LLC;
SAVASENIORCARE, LLC; and
SSC SPECIAL HOLDINGS LLC,

          Defendants.

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT SAVASENIORCARE, LLC'S
MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

I.     Viewed in a light most favorable to Plaintiff, the "pleading allegations" and the facts of this case demonstrate that Plaintiff has established a "prima facie showing" of in *personam* jurisdiction over Defendant SavaSeniorCare, LLC.

In the case at hand, Defendant SavaSeniorCare, LLC ("SSC") contends, emphatically, that this Court lacks *in personam* jurisdiction because it has "**no presence in West Virginia and had absolutely nothing to do with the [local] Facility's [Seventeenth Street Associates, LLC d/b/a Huntington Health and Rehabilitation Center] care and treatment of Mr. [Gene] Harrison.**"[1]   (See *Memorandum in Support of Defendant SavaSeniorCare's Motion to*

---

[1] Seventeenth Street Associates, LLC d/b/a Huntington Health and Rehabilitation will hereinafter be referenced as the "local facility."

*Dismiss Plaintiff's Complaint* (hereinafter "*Memorandum*") at unnumbered page 1). Following this emphatic contention and the denouncement of Plaintiff's Complaint as "unfortunate" and "indiscriminate", SSC utilizes the affidavit of Wynn G. Sims to profess all of the reasons SSC is not subject to the *in personam* jurisdiction of this Court.

Those reasons include, but are not limited to, the following:  (1) SSC "holds only a distant, indirect ownership interest in the Facility";[2]   (2) SSC "had no control over the Facility's operations or its provision of care to residents, including Mr. Harrison"; (3) "none of the facility's staff is employed by or an agent of SavaSeniorCare"; (4) SSC "never has had employees or agents at the Facility, or any other healthcare facility in West Virginia"; (5) SSC did "not prepare or issue paychecks to employees of the Facility"; (6) SSC "does not devise or implement other policies or procedures for the Facility"; (7) SSC has never made "human resources, staffing, training, or budgeting decisions with respect to the Facility, or supervised the Facility's employees"; (8) SSC "does not derive any revenues from the Facility or any other source in West Virginia"; (9) SSC "has no right to control the Facility's management or operations"; and (10) "SSC has no right to share in the profits, nor has a duty to pay any losses, of the Facility."  (Memorandum at pages 2 through 4).

SSC clearly seeks to distance itself from the local facility so that it can be dismissed from this matter.  SSC's contentions, however, are contradicted by the sworn testimony of the local facility's administrator, Annica Stansberry, proffered in three depositions on three different cases.  Plaintiff's counsel took those depositions on October 16, 2006; May 29, 2008; and January 6, 2015.  That testimony is as follows:

---

[2] In its *Memorandum*, SSC never explains its "distant, indirect ownership in the (local) facility."

October 16, 2006 deposition testimony

| | |
|---|---|
| Q. | The facility in Huntington that you work at currently is Mariner Health Care Center? |
| A. | No, sir. |
| Q. | What's the name of it? |
| A. | Huntington Health and Rehabilitation. |
| Q. | Has that been the name of the facility since you started there? |
| A. | No, sir. |
| Q. | Do you remember the date you started? |
| A. | Yes, August 27th, 2003. |
| Q. | What was the name of the facility at that time? |
| A. | Mariner of Huntington. |
| Q. | Mariner of Huntington? |
| A. | Yes, sir. |
| Q. | It's currently Huntington Health and Rehab? |
| A. | Huntington Health and Rehab. |
| | |
| Q. | And has it gone by any other names? |
| A. | No, sir. |
| Q. | Do you know why the name change was implemented? |
| A. | Yes, sir. |
| Q. | Why? |
| A. | We were bought by another company. |
| Q. | Who owned the company when you started in August '03? |
| A. | Mariner. |
| Q. | Where are they located? |
| A. | Well, they have offices in Atlanta and Houston. |
| Q. | Where was the first place? |
| A. | Atlanta. |
| Q. | And Houston? |
| A. | Uh-huh. |
| Q. | Do you know which one is the official headquarters? |
| A. | No, sir.  They have different functions. |
| Q. | And when did Huntington Health – who were they bought out by, Mariner? |
| A. | Sava Senior Care. |
| Q. | Can you spell that? |
| A. | S-a-v as in Victor –a. |
| Q. | Sava what? |
| A. | Senior Care. |
| Q. | And when did that occur, the buyout? |
| A. | In – I don't know the date of the buyout. |
| Q. | When did it start operating as Sava – or when did it start operating as Huntington Health and Rehab? |

3

A.      January 13th of 2006.


Q.      Where is Sava headquartered?
A.      They have field offices in Atlanta and Houston.
Q.      To your knowledge, do they operate any other facilities in West Virginia, other than Huntington Health and Rehab?
A.      No, sir.


**May 29, 2008 deposition testimony**

Q.      And who is the current owner (of Huntington Health and Rehabilitation)?
A.      Sava, S-A-V as in Victor, A, Senior Care.
Q.      Where are they located?
A.      They have offices in Atlanta, Georgia and Houston, Texas.
Q.      And how many nursing homes do they own; do you know?
A.      Approximately 188.
Q.      And how many do they own in West Virginia?
A.      One.

Q.      Are they your employer; is that who your check is –
A.      Sava Senior Care, yes, sir.
Q.      Okay.  And you're an adminis – the administrator at this facility, right?
A.      Yes, sir.


**January 6, 2015 deposition testimony**

Q.      Okay.  From a prior deposition that you gave back in, I guess, 2008, which may have been something you were more familiar with then, because it was closer in time, you said Mariner Health Care was sold to the current owner who was Victor Sava.
Mr. Stewart:   Sava Senior Care.
By Mr. Paternostro:
**Q.      Sava Senior Care, does that ring any bells for you?**
**A.      That's a management company, a consulting company.**
Q.      Okay.  I'm going to read you what some of the questions and answers were.  Okay?  And this is just to see if we can get straight who owns what.  "Who was the owner when it was Mariner of Huntington?"
You said, "Mariner Health Care."

"And it was sold?"
You answered, "Yes."
"To the current owner?"
"Yes." And this is back in 2008.
"And who is the current owner?"
And then you said, "Sava, S-a-v, as in Victor, -a Senior Care."
"Where are they located?"
"They have office in Atlanta, Georgia, and Houston, Texas."
"How many nursing homes do they own?  Do you know?"
"Approximately 188."
"And how many do they own in the State of West Virginia?"
"One."
"And is that the one you work at?"
"Yes, sir."
"Are they your employer?  Is that what your check is?"
And then you answered, "Sava Senior Care, yes, sir."
Does that ring any bells?

A.    (Nods negatively.)


Q.    So who was this Senior Care – Sava Senior Care that you talked about owning approximately 188 facilities, one of them being in West Virginia? Who is that?
A.    I believe I just answered that.  That's a consulting firm.
Q.    Okay.  Do they own Seventeenth Street Associates?
A.    I have no idea.
Q.    I asked you this question.  "Are they your employer?  Is that what your check is?"
      And then you answered, "Sava Senior Care, yes, sir."
      Okay? That was back in May of 2008.  That's what you said under oath.  Is there something that has changed since then?
A.    I have no idea.  I work for Seventeenth Street Associates.


Q.    Okay.  How about Wynn Simms? W-y-n-n.
A.    I know who she is.
Q.    Okay.  Would it – do you know what – who is she?
A.    She works for either the consulting company or – I don't know what the other part of it's called.
Q.    Do you use a consulting company as – You're employed by who?
A.    Seventeenth Street Associates.

Q.      Okay.  Do you use a consulting company for certain aspects of your facility?

A.      There are two branches, and I think one of them may – I don't know what the other one's called.  It's Sava Senior Care Consulting, and then there's another piece of it, and one of them provides things like HR services, payroll, that kind of thing.  The other one is field support such as – I'm just trying to think of some of the – like management, assistance and field support.

Q.      You believe that there are two entities that provide – What did you call it? Certain services?

A.      Like consulting field support.

Q.      Now, when I took your deposition -- this is a different one in 2006 of October -- I asked where you worked, and you referred to it as Huntington Health and Rehab, previously owned by Manor -- Manor -- Mariner, and I asked you, "Do you know why the name change was implemented?"
"Yes, sir."
"Why?"
"We were bought by another company."
Question, "Who owned the company when you started in August of 2003?"
"Mariner."
"Where were they located?"
"Well, they have offices in Atlanta and Houston."
"And when did Huntington Health -- who were -- who were they bought out by?" Mariner.  I asked you, "Who were they bought out by?" meaning Mariner.
You said, "Sava Senior Care."
"When did the buyout occur?  When did it start operating as Sava, or when did it start operating as Huntington Health and Rehab?"
"January 13th of 2006."
Okay?  Does that ring any bells as to who Sava Senior Care is?

A.      I just told you that Sava has consulting services.  They provide field support.  There's another branch that's called something else.  I – I don't know what you're asking me.

Q.      Where do you get money from to run your budget?

A.      I don't know the answer to that.

6

Q.      Well, I mean, do you have a – a bank account in Charleston that when somebody delivers – or I'm sorry – in Huntington where someone delivers, you pay for it and write a check?

A.      We don't have a bank account in Huntington.

Q.      Okay.  Do you write checks for any of the items that come into the Huntington facility, such as food, linens, whatever you may need?

A.      There's a very detailed electronic process for that.

Q.      Okay.  Well, who runs that?  Who is the entity or persons that are – that are making payments on items you need for your facility?

A.      We have field support services who do accounts payable.

Q.      Where are they located?

A.      In Houston, the accounts payable office.


Q.      So this field support services entity or whatever they are, these people, they're located in Houston?

A.      For accounts payable.


Q.      The money you get to operate your budget, where does that come from?

A.      I already answered that, sir.

Q.      All of it?

A.      I don't know that.


Q.      All right.   So that money, those expenses, as I understand it, are handled by – at least part of those, some field service support system or field support services system over in Houston.  Is that correct?

A.      I said accounts payable is in Houston, sir.


Q.      All right.  What about your account receivables?  Where do they go?

A.      What do you mean account receivable, where does that go?

Q.      Well, do you get money that comes into your Huntington Health and Rehab Center?  Do they get money?

A.      Yeah.  Yes, sir.

Q.      Okay.  Where's it go?

> **A.** There's just a detailed process again.  There's an electronic depository, and there is also a locked depository.
>
> **Q.** Okay.  Where's it – where does it end up?  Where does this deposited money end up?  Does it end up in Pittsburgh, Houston, Michigan?  I mean, is there some central location the money goes to?
>
> **A.** I don't know that.
>
> **Q.** And are there policies that are implemented and procedures implemented to prohibit mistreatment, neglect, and abuse of residents at your facility?
>
> **A.** Yes.
>
> **Q.** And who develops and writes these policies?
>
> **A.** I don't know.
>
> **Q.** Do they just show up in a little booklet from an unknown source?
>
> **A.** We have manuals.
>
> **Q.** Where do they come from?
>
> **A.** I don't know.[3]

SSC's affidavit, that forms the basis for SSC's Motion, is inapposite to the sworn testimony of Administrator Annica Stansberry.  According to Ms. Stansberry, SSC is the owner of the local facility, and Ms. Stansberry is, or was, an employee of SSC.  Also, SSC currently provides "consulting" and "management" services to the local facility.  The money flow, in and out of the local facility, involves some entity in Houston where SSC is located.  Again, the above sworn testimony was derived from depositions taken on October 16, 2006; May 29, 2008 and January 6, 2015.  Ms. Stansberry changed some of her testimony in January 2015, but her testimony certainly creates issues of fact that need to be resolved before SSC's Motion can be decided.  Those issues include, but are not limited to, the following:  ownership of the local facility; management of the local facility; the providing of

---

[3] The deposition testimony is attached to this Response as Exhibit 1.

"consulting services" to the local facility; the flow of money in and out of the local facility; and the employer of local facility employees. [4]

In *Celotex Corporation v. Rapid American Corporation*, 124 F.3d 619 (4th Cir. 1997), the United States Court of Appeals, Fourth Circuit, set forth the following pronouncement regarding the level of proof by which a Motion brought pursuant to Federal Rule of Civil Procedure 12(b)(2) should be evaluated:

> When, as here, a court's power to exercise personal jurisdiction over a non-resident defendant is challenged by a motion under Federal Rules of Civil Procedure 12(b)(2), the jurisdictional question thus raised is one for the judge, with the burden on the plaintiff ultimately to prove the existence of a ground for jurisdiction by a preponderance of the evidence. **Furthermore, when, as here, a district court rules on a Rule 12(b)(2) motion without conducting any evidentiary hearing or without deferring ruling pending receipt at trial of evidence relevant to the jurisdictional issue, but rather relies on the complaint and affidavits alone, the burden on the plaintiff is simply to make a prima facie showing of a sufficient jurisdictional basis in order to survive the jurisdictional challenge. In considering a challenge on such a record, the court must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction.**

*Id*. at 628 (citations and quotations omitted) (emphasis added).

With regard to the exercising of personal jurisdiction itself the Court stated:

> In order for a court to validly exercise personal jurisdiction over a non-resident defendant: (1) a statute must authorize service of process on the non-resident defendant, and (2) the service of process must comport with the Due Process Clause. **Because the West Virginia long-arm statute is coextensive with the full reach of due process, it is unnecessary in this case to go through the normal two-step formula in determining the**

---

[4] As this Court can tell by reading Defendant's *Memorandum*, Defendant's counsel has repeatedly chastised and criticized Plaintiff's counsel for the filing of this suit, even suggesting that Plaintiff's amended Screening Certificates of Merit are "knowingly false." The specifics of that allegation will be addressed later in this Response. It is preposterous to make such an allegation in light of Ms. Stansberry's deposition testimony.

> existence of personal jurisdiction.  Rather, the statutory inquiry necessarily merges with the Constitutional inquiry.
>
> A court's exercise of personal jurisdiction over a non-resident defendant is consistent with the Due Process Clause **if the defendant has sufficient "minimum contacts" with the forum such that requiring the defendant to defend its interests in the forum does not "offend 'traditional notions of fair play and substantial justice'."**

*Id*. at 627-28 (citations omitted) (emphasis added).

Again, Administrator Annica Stansberry identified her employer and the owner of the local facility to be SSC.  She also identified SSC as providing "management assistance and field support" and "consulting field support."  If Ms. Stansberry's testimony is correct, SSC falls within the *in personam* jurisdiction of this Court.  It is inconceivable for SSC to suggest, that as owner of the local facility and employer of the very person charged with nursing care at the local facility, it does not have "minimum contacts" with this forum.  It would also be inconceivable for SSC to suggest that requiring it to defend its interest in this forum would "offend traditional notions of fair play and substantial justice."

To the extent there exists a conflict between the sworn testimony of Ms. Stansberry and the affidavit of Wynn Simms, Plaintiff is entitled to discovery to resolve that conflict. *Serras v. First Tennessee Bank National Association*, 875 F.2d 1212, 1214 (6th Cir. 1989) (noting that when presented with a motion to dismiss for lack of personal jurisdiction, the Court may allow discovery if "the written submissions raise disputed issues of fact or seem to require determination of credibility").  *Compagnie des Bauxites de Guinee v. L'Union Atlantique S.A. d' Assurances*, 723 F.2d 357, 362 (3d. Cir. 1983) (noting that "where the plaintiff's claim is not clearly frivolous, the district court should ordinarily allow discovery on jurisdiction in order to aid the plaintiff in discharging that burden").

In addition to the sworn testimony of Administrator Annica Stansberry, there exist other facts demonstrating that SSC and the other corporate defendants are proper parties to this matter and subject to the in *personam* jurisdiction of this Court.  First, the local facility, Seventeenth Street Associates, LLC d/b/a Huntington Health and Rehabilitation Center, lists as its officer Wynn Simms.  She is also an officer of SavaSeniorCare.  (See information from West Virginia's Secretary of State's office attached as Exhibit 2).  Second, the local facility's "Financial Disclosures" for the years 2013 and 2014 are signed by Ken Pitts.  His e-mail address is KAPitts@SavaSC.com.  The "Balance Sheets," "Income Statements," and "Trended Summary Budgets" submitted with the disclosures prominently display the moniker SavaSeniorCare.  (See 2013 and 2014 "Financial Disclosures" attached as Exhibit 3).  Third, SSC does the hiring for its local facilities, including Huntington Health and Rehabilitation Center.  SSC employs a recruiter, Ginger Shaffer, who can be contacted at GLShaffer@SavaSC.com for employment opportunities at Huntington Health and Rehabilitation Center.  The positions currently open are as follows:  Physical Therapist; Resident Care Specialist, CNA; Registered Dietician; Social Worker – Degreed; RN (Registered Nurse); Resident Care Specialist, CNA in Training; and Food Service Aid.  (See SavaSeniorCare's job opportunity documents attached as Exhibit 4).

II.   **Plaintiff's complied with the West Virginia Medical Professional Liability Act and has properly set forth claims against SavaSeniorCare, LLC.**

SSC's argument that this matter should be dismissed because Plaintiff has failed to state a claim against SSC is as specious as its argument regarding in *personam* jurisdiction.  Plaintiff fully complied with the West Virginia Medical Professional Liability Act ("MPLA") by submitting a proper Certificate of Merit outlining, with particularity, the specific breaches in

the nursing standard of care committed by the individuals at the local facility. The Certificate of Merit, in pertinent part, provides:

> That my good faith investigation regarding the care and treatment of Gene Arthur Harrison revealed that he suffered from avoidable harm and injury as a result of custodial neglect by Huntington Health and Rehabilitation Center. As a direct result of the neglect, Gene Arthur Harrison sustained avoidable and preventable injuries and harm including, but not limited to, septic shock and possible ascending cholangitis related to infected pus-like drainage from his biliary drain growing Escherichia coli. Huntington Health and Rehabilitation Center staff deviated from the standard of care when they failed to provide proper monitoring and care of Mr. Harrison's biliary drain tube. These avoidable and preventable injuries were directly related to basic custodial neglect, which was perpetrated by Huntington Health and Rehabilitation Center. The aforementioned conditions and other avoidable injuries were directly caused by the negligence of Huntington Health and Rehabilitation Center, its staff, employee, directors, agents, administration and representatives.

As the owner of the local facility and as the employer of the local facility's administrator, SSC is directly liable for the negligence committed at the local facility by the facility's administrator and nurses. See *Cunningham v. Herbert J. Thomas Hospital Association*, 737 S.E.2d 272, 275 (W.Va. 2012) and *West Virginia Code* § 55-7B-9(g) (2015) (noting that "nothing in this article is meant to preclude a health care provider from being held responsible for the portion of fault attributed by the trier of fact to any health care provider's agent or servant or to preclude imposition of fault otherwise imputable or attributable to the health care provider under claims of vicarious liability"). As such, the Screening Certificate of Merit applies not only to the local facility, but also SSC.

Defendants argue, repeatedly, that Plaintiff's counsel has attempted to avoid and circumvent the MPLA "via artful pleading." Moreover, in an effort to further impugn the integrity of Plaintiff's counsel, SSC boldly asserts that Plaintiff's "pre-suit papers are

deficient because they are knowingly false" and that "there is compelling proof that Ms. Thomas (the nurse that issued them) conducted no investigation to support her assertion that she had a 'good faith basis or a reasonable belief' that Mr. Harrison was injured by the neglect of SavaSeniorCare, LLC and other non-facility Defendants." (*Memorandum* at pages 13-14).[5]

SSC's needless bloviating intentionally misses the point and is designed, instead, to obscure that which is plainly obvious: SSC, as owner of the local facility and employer of its administrator, is liable for the neglect that occurred at that facility.  The nurse who reviewed this case on behalf of Plaintiff reviewed records from the local facility and based her opinion, regarding breaches in the standard of care, on those records.  Plaintiff's attorney then made the decision as to what corporate entities could ultimately be held responsible for the misconduct that occurred at the local facility.  Again, it is important to remind this Court that one of those factors was the testimony of Administrator Annica Stansberry, **attributing ownership and control of the local facility to SSC.**

It is inconceivable to think that a nursing expert, before issuing a Screening Certificate of Merit, should be required to ascertain the corporate structure of the various corporate entities and determine whether those entities may ultimately be held liable for the neglect that occurred at the local facility.  The nursing expert is only tasked with outlining the beaches in standard of care that she observed.  The corporate defendants in this case have intentionally made the task of determining who is liable for the neglect occurring at the local

---

[5] Plaintiff also takes umbrage with another statement SSC's counsel made in his *Memorandum* and feels compelled to address it with this Court.  SSC's counsel states that Plaintiff's counsel wrote the screening certificate and retained a nursing expert that is nothing more than a "mere rubber stamp." Nothing is further from the truth, and Plaintiff's counsel expressed that fact to SSC's counsel well before he filed his *Motion*, when SSC's counsel first made that accusation.  Nonetheless, SSC's counsel felt compelled to make that assertion in his *Memorandum* to this Court, knowing it to be false.

facility impossible to ascertain, absent the implementation of discovery.  SSC would have this Court believe that the local facility is a stand-alone facility, with no ties to any of the named corporate entities.  This position is refuted by the testimony of Administrator Annica Stansberry.

Moreover, if SSC's counsel had properly consulted with the **local facility's counsel**, he would have been apprised of the "good faith" basis that Plaintiff's counsel had for including SSC as a party to this matter, **that being the sworn testimony of the local facility's administrator.**  According to SSC's counsel, he conferred with the **local facility's counsel** to discredit Plaintiff's counsel, by ascertaining that the records from the local facility did not mention SavaSeniorCare: "We conferred with counsel for the local facility who has advised that Mr. Harrison's medical records do not even mention SavaSeniorCare, LLC or the other non-Facility defendants."  (Memorandum at 14).  One wonders if SSC's counsel intentionally failed to ascertain the testimony of Ms. Stansberry or simply chose not to disclose it to this Court.[6]

To the extent that SSC's counsel is now upset, offended by or appalled with Plaintiff's counsel for submitting **additional Screening Certificates of Merit** against all corporate defendants, this Court should take note of the following:  **Plaintiff's counsel initially proffered a single Screening Certificate of Merit against only the local facility, the only known healthcare provider.**  Plaintiff did not initially believe that SSC and the other corporate defendants constituted "healthcare providers" as defined by the MPLA and, thus, no Screening Certificates of Merit were necessary.  See *West Virginia Code* § 55-7B-2(g) (noting that a health care provider "means a person, partnership, corporation, professional limited

---

[6] Current counsel for the local facility, Anders Lindberg, was present at two of the aforementioned depositions of Administrator Annica Stansberry.  Counsel for SSC and counsel for the local facility are from the same firm.

14

liability company . . . **licensed by, or certified in, this state or another, to provide health care**)
(emphasis added).  See *West Virginia Code* § 55-7B-6(b) (noting that at least thirty days
prior to the filing of a medical malpractice professional liability action against a health care
provider, **the claimant shall serve . . . a notice of claim on each health care provider the
claimant will join in the litigation**) (emphasis added).  Plaintiff intended to pursue her claims
against SSC and the other corporate defendants through vicarious liability or under the
theory of "corporate negligence" as set forth in the West Virginia case of *Manor Care, Inc. v.
Douglas*, 763 S.E.2d 73 (W.Va. 2014).

SSC's counsel, however, vehemently berated and chastised Plaintiff's counsel's
decision for not providing Screening Certificates of Merit for SSC and the remaining
corporate defendants.  His letter of July 9, 2015, in pertinent part provides:

> **As you know, W.Va. Code § 55-7B-6 mandates that a suit may
> not be instituted against a WEST VIRGINIA HEALTH CARE
> PROVIDER unless 30 days prior to filing the complaint, each
> healthcare provider to be sued is served with a Notice of Claim
> specifying the theories of liability to be asserted and including a
> Screening Certificate of Merit completed by a qualified expert.**
> The West Virginia Supreme Court of Appeals has determined
> that the statutory purposes of these requirements are "(1) to
> prevent the making and filing of frivolous medical malpractice
> claims and lawsuits; and (2) to promote the pre-suit resolution
> of non-frivolous medical malpractice claims."  **As to SSC
> Huntington Operation Company, LLC [sic], SSC Special
> Holdings, LLC [sic], SSC Equity Holdings, LLC, SSC Submaster
> Holdings, LC [sic]   SavaSeniorCare, LLC [sic] and SMV
> Huntington, LLC your Notice of Claim and Screening Certificate
> of Merit are deficient in meeting both the purposes and the
> letter of the statutory mandate.**
>
> **You also failed to comply with the statute by not providing a
> separate screening certificate of merit to each of the potential
> defendants identified in you Notice of Claim.**  Instead, your
> Screening Certificate of Merit is directed only to Huntington
> Health and Rehabilitation Center and is devoid of
> factual/medical claims as to SSC Huntington Operation
> Company, LLC [sic], SSC Special Holdings, LLC [sic], SSC Equity

> Holdings, LLC, SSC Submaster Holdings, LC [sic]
> SavaSeniorCare, LLC [sic] and SMV Huntington, LLC. As
> required by *Hinchman*, other defects in your Screening
> Certificate of Merit are identified below. (emphasis added).

After receiving SSC's **informative** letter, Plaintiff's counsel realized he was wrong in his initial belief that SSC and the other corporate defendants were not medical providers and, thus, submitted the additional certificates. The additional certificates are, and should be, identical to the original certificate, as it is the care at the local facility that serves as the genesis of Plaintiff's case. The only questions to be decided are what corporate entities are responsible for the local facility's neglect (vicarious liability) and whether there exists evidence of "ordinary" or "corporate negligence" that falls outside the MPLA.[7]

Finally, this Court should note that Plaintiff's counsel, before the filing of this Response, called SSC's counsel and asked whether the corporate defendants were "health care providers" under the MPLA. For some unknown reason, SSC's counsel refused to take a position on that issue. Thus, Plaintiff's counsel must reiterate enough the bizarre and contrary positions taken by SSC's counsel. Through his letter, SSC's counsel chastised Plaintiff's counsel for not submitting Screening Certificates of Merit for SSC and the other corporate defendants, but he now refuses to affirmatively state that SSC and the other corporate defendants are "health care providers" as defined under West Virginia law, thereby necessitating the submission of Screening Certificates of Merit. SSC and the other corporate entities are either health care providers and entitled to Screen Certificates of Merit, or they are not. SSC's counsel should advise this Court of his position.[8]

---

[7] Plaintiff's claim for ordinary or corporate negligence is found in Count III of the Complaint.

[8] SSC's counsel has "artfully" painted Plaintiff's counsel into a corner by demanding Screening Certificates of Merit to which he was not entitled. He now, with self-righteous indignation, chides Plaintiff's counsel for those "false" certificates with a childish tone of "liar, liar pants on fire." His current diatribe, however, is nothing more than a "tale/. . .full of sound and fury,/ Signifying nothing" William Shakespeare, "The Tragedy of Macbeth" act 5, sc. 5.

III.     Conclusion

The allegations set forth in Plaintiff's Complaint, and the testimony of Administrator Annica Stansberry, establish that SSC is subject to the in *personam* jurisdiction of this Court. To the extent that there exists a question regarding jurisdiction, Plaintiff is entitled to discovery.  Also, Plaintiff's Complaint properly states a claim against SSC under the West Virginia MPLA.  Accordingly, SSC's Motion should be denied.

Respectfully submitted,

/s/Andrew L. Paternostro
Andrew L. Paternostro, Esquire (WV Bar No. 5541)
Jeff D. Stewart, Esquire (WV Bar No. 9137)
**THE BELL LAW FIRM, PLLC**
Post Office Box 1723
Charleston, West Virginia 25326
(304) 345-1700 / (304) 345-1715 (Fax)
          *Counsel for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

ALICIA CRABTREE, as
Power of Attorney for
GENE HARRISON,

        Plaintiff,

v.                                        Civil Action No.: 3:15-CV-13318

SEVENTEENTH STREET ASSOCIATES, LLC d/b/a
HUNTINGTON HEALTH AND REHABILITATION CENTER;
SMV HUNTINGTON, LLC;
SSC HUNTINGTON OPERATING COMPANY LLC;
SSC SUBMASTER HOLDINGS LLC;
SSC EQUITY HOLDINGS MT LLC;
SAVASENIORCARE, LLC; and
SSC SPECIAL HOLDINGS LLC,

        Defendants.

## CERTIFICATE OF SERVICE

I, Andrew L. Paternostro, counsel for Plaintiff, hereby certify that I have electronically filed with the Clerk of Court **Plaintiff's Response in Opposition to Defendant SavaSeniorCare's Motion to Dismiss** and a true copy of the foregoing shall be served electronically upon all counsel of record as indicated below, on this the 9th day of October, 2015.

        John J. Meadows, Esquire
        Steptoe & Johnson, PLLC
        Post Office Box 1588
        Charleston, West Virginia 25326
            *Counsel for SavaSenior Care, LLC; SSC Submaster Holdings LLC; SSC Special Holdings LLC; SSC Equity Holdings MT LLC; SMV Huntington LLC; and SSC Huntington Operating Company, LLC*

18

Anders W. Lindberg, Esquire
Jessica J. Wiley, Esquire
Andrew P. Smith, Esquire
P.O. Box 2195
Huntington, West Virginia 25722
*Counsel for Seventeenth Street Associates, LLC d/b/a Huntington Health and Rehabilitation Center*


 /s/Andrew L. Paternostro
Andrew L. Paternostro, Esquire (WV Bar No. 5541)
Jeff D. Stewart, Esquire (WV Bar No. 9137)
**THE BELL LAW FIRM, PLLC**
Post Office Box 1723
Charleston, West Virginia 25326
(304) 345-1700 / (304) 345-1715 (Fax)
*Counsel for Plaintiff*